**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MICHAEL SCROGGINS o/b/o BERTHA M. WALTON,

      Plaintiff,

      v.

IMERYS TALC AMERICA, INC., *et al.*,

      Defendants.

Civil Action No. 18-12766 (MAS) (RLS)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

  This matter comes before the Court upon Defendants Johnson & Johnson ("J&J") and J&J Consumer Inc.'s ("J&J Inc.") (collectively "Defendants") Omnibus Motion for Summary Judgment. (ECF No. 41.) This Opinion concerns only Defendants' Motion for Summary Judgment against Plaintiff Michael Scroggins ("Scroggins") o/b/o Bertha M. Walton's ("Walton") claims. Plaintiff opposed Defendants' Motion for Summary Judgment (ECF No. 43), and Defendants replied (ECF No. 44). After careful consideration of the parties' submissions, the Court decides Defendants' motion without oral argument pursuant to Local Civil Rule 78.1. For the reasons outlined below, Defendants' Motion for Summary Judgment against Scroggins's claims is denied.

**I. BACKGROUND**

  On April 26, 2018, Walton originally filed this action in the United States District Court for the District of Columbia ("D.C."). (ECF No. 1.) On August 14, 2018, Walton's action was transferred to this Court for consolidated pretrial proceedings. (ECF Nos. 13, 15.) Despite filing

this lawsuit in D.C., Walton was a lifelong resident of Louisiana. (Defs.' Statement of Undisputed Material Facts ("DSUMF") ¶ 12, ECF No. 41-3; Defs.' Ex. 23, Hawkins Dep. *202,[1] ECF No. 41-4.) On August 28, 2019, during the course of this litigation, Walton passed away. (DSUMF ¶ 13; Suggestion of Death, ECF No. 27.) Walton's son, Scroggins, continued this matter on behalf of his mother. (Mot. to Substitute Order, ECF No. 37.)

The following facts are material and undisputed. Scroggins testified, to the best of his recollection, that Walton used J&J Baby Powder in or around 1966, and again between 1971 and 1981. (Defs.' Moving Br. 3; Defs.' Ex. 2, Scroggins Dep. 35:11-36:15, ECF No. 43-2.) Scroggins also testified that he never personally observed Walton using J&J Baby Powder. (DSUMF ¶ 15; Defs.' Ex. 24, Scroggins Dep. *217, 30:1-32:19, ECF No. 41-4.)

Walton's sister, Eloise Hawkins ("Hawkins"), testified that she observed Walton use J&J Baby Powder from approximately 1959 or 1960 to 1964 or 1965. (DSUMF ¶ 17; Pl.'s Opp'n Br. 2, ECF No. 43; *see* Defs.' Ex. 23, Hawkins Dep. *201, *204-06.) Specifically, Hawkins testified that during this period she witnessed Walton put J&J Baby Powder in her underwear after her bath at least every other night. (Pl.'s Opp'n Br. 2; *see also* Defs.' Ex. 23, Hawkins Dep. *209-10.)

## II.   LEGAL STANDARD

The Federal Rules of Civil Procedure[2] provide that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and

---

[1] Page numbers preceded by an asterisk reflect page numbers atop the ECF header.

[2] All references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist). "[U]nsupported allegations in . . . pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . [t]here can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment

standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

### III. DISCUSSION

Defendants contend that they are entitled to summary judgment for two principal reasons: (1) because the evidence in the record is insufficient under Louisiana law to show that talcum-based J&J Baby Powder substantially caused Walton's ovarian cancer; and (2) because Scroggins failed to produce sufficient evidence that Walton used talcum-based J&J Baby Powder products as opposed to cornstarch-based J&J Baby Powder. (Defs.' Moving Br. 56-59, ECF No. 41-1.) Scroggins in opposition contends that: (1) Defendants failed to conduct an appropriate conflict-of-law analysis and, accordingly, Scroggins's claims should be considered under D.C. law; (2) sufficient evidence exists in the record to establish a genuine dispute of material fact as to the issues Defendants raise; and (3) Defendants' Motion is premature because the parties have not yet engaged in case-specific expert discovery. (Pl.'s Opp'n Br. 6-12; *see* Defs.' Reply Br. 24-28, ECF No. 44.) The Court considers each of Scroggins's contentions in turn.

#### A.   Conflict-of-Law Analysis

Scroggins contends that D.C. law applies to his claims. (Pl.'s Opp'n Br. 6-8.) Defendants contend, on the other hand, that Louisiana law applies because Walton was from Louisiana and spent the duration of her life in Louisiana. (Defs.' Moving Br. 55-56, Defs.' Reply Br. 24-25 n.9.) "In an MDL proceeding, the transferee court applies 'the choice of law rules of the transferor courts.'" *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., and Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) (quoting *Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997)); *see also In re Delta Dental Antitrust Litig.*, 509

F. Supp. 3d 1377, 1380 (J.P.M.L. 2020) ("[I]n the MDL, [an individual's] action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 17-18 (1st Cir. 2012))).[3] Walton's Complaint was transferred to this Court by the D.C. District Court. (*See generally*, Compl.) Accordingly, this Court applies D.C. choice-of-law rules.

"Under [D.C.] law, the first step in a choice-of-law analysis is to determine 'whether a [conflict] exists between the laws of the [competing] jurisdictions.'" *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 27 (D.D.C. 2019) (second alteration in original) (quoting *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51-52 (D.C. Cir. 2014)). In assessing the presence of a conflict, courts can reach one of two possible outcomes. First, a "false conflict" arises when either:

> (1) the laws of the interested states are the same; (2) when those laws, though different, produce the same result when applied to the facts at issue; or (3) when the policies of one state would be advanced by the application of its law and the polices of the states whose laws are claimed to be in conflict would not be advanced by application of their law.

*Atlanta Channel, Inc. v. Solomon*, 583 F. Supp. 3d 174, 197 (D.D.C. 2022) (citations omitted); *see also Barimany v. Urban Pace LLC*, 73 A.3d 964, 968 (D.C. Cir. 2013) (outlining another possible outcome, "no conflict," as separate from a "false conflict" but where "no conflict" was defined exactly the same as a "false conflict" as outlined in the first and second prong above (citing *USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C 2008))).

---

[3] On issues of federal law or federal procedure, however, the transferee court applies "the law of the circuit where it sits." *Various Plaintiffs v. Various Defendants ("Oil Field Cases")*, 673 F. Supp. 2d 358, 362 (E.D. Pa. 2009).

Second, a "true conflict" arises when both states have an interest in applying their own laws to the facts of the case and the law of the competing jurisdictions is different. *Krukas*, 376 F. Supp. 3d at 27 (quoting *In re APA Assessment Fee Litig.*, 766 F.3d at 51-52).

"Only if [a true conflict] exists must the court then determine, pursuant to [D.C.] choice of law rules, which jurisdiction has the 'more substantial interest' in the resolution of the issues." *Bailey v. J&B Trucking Servs., Inc.*, 590 F. Supp. 2d 4, 9 (D.D.C. 2008) (quoting *YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002)); *see also Adams v. Martinsville Dupont Credit Union*, 573 F. Supp. 2d 103, 110 (D.D.C. 2008). "If 'there is no "true conflict"' among the purportedly interested jurisdictions," and D.C. is one of the contended conflicting jurisdictions, D.C. courts will apply D.C. law by default. *Solomon*, 583 F. Supp. 3d at 197 (citations omitted).

Scroggins contends that there is no true conflict between D.C. law and Louisiana law as to the relevant issue challenged in Scroggins's product liability claims: causation. (Pl.'s Opp'n Br. 6-8.) In so contending, Scroggins appropriately analyzes relevant D.C. and Louisiana case law in concluding that there is no conflict of law necessitating a choice-of-law analysis.[4] (*Id.* at 7-8.) Defendants, on the other hand, did not conduct a conflict analysis in their moving brief, but instead advanced three contentions for the presence of a true conflict between Louisiana and D.C. law in a footnote in their reply brief. (Defs.' Reply Br. 24-25 n.9.) The three contentions advanced by Defendants are that: (1) "this case has nothing to do with D.C."; (2) D.C. and Louisiana law are

---

[4] The Court notes that Scroggins brings seventeen counts in his Complaint. (*See generally* Compl.) "Under proper conflict of laws principles, the Court is to conduct the choice of law analysis for each distinct issue being adjudicated." *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (citation omitted). Here, Defendants put the issue of causation before the Court and contend that Louisiana law applies. (Defs.' Moving Br. 55-59.) Defendants, however, do not provide a sufficient conflict analysis for the issue of caustion in their moving brief, and Defendants do not conduct an issue-based conflict analysis in their reply brief. (*See generally* Defs.' Moving Br.; Defs.' Reply Br.) To this end, Defendants fail to sufficiently brief the conflict issues in this matter.

materially different because Louisiana is not a common-law jurisdiction and its product-liability claims are statutory; and (3) D.C. and Louisiana apply different standards to "allegations of product defect," contending that Louisiana applies a risk-utility test but that D.C. applies a consumer expectation or risk-utility test depending on the circumstances. (*Id.*)

Defendants' contentions are all unpersuasive. Defendants' first contention depends on the premise that Walton's complaint was filed in D.C. exclusively to take advantage of D.C.'s longer statute of limitations rule and the discovery rule. (*Id.* at 24 n.9.) Such contention, even if true, has no bearing on whether or not D.C. and Louisiana's laws conflict. Assuming a court has personal jurisdiction over Defendants, where Walton decided to file her complaint was her prerogative.

Defendants' second contention fails because the case law Defendants provide, *Adams v. Martinsville Dupont Credit Union*, does not support their contention that Louisiana's civil law regime creates an inherent conflict of law with any other state that adheres to a common-law regime. (*Id.* (citing *Adams v. Martinsville Dupont Credit Union*, 573 F. Supp. 2d 103, 110 (D.D.C. 2008) (providing that "[w]here a cause of action exists in one jurisdiction, but is not recognized as a cause of action in another, it is axiomatic that a true conflict of law exists")).) In *Adams*, the D.C. District Court conducted a conflict of law analysis between Virginia and D.C. law. *Adams*, 573 F. Supp. 2d at 110. The *Adams* defendant contended that the plaintiff's claims for "negligent misrepresentation, bad faith, breach of [the] covenant of good faith and fair dealing, [and] emotional distress [were] not recognized as independent causes of action under Virginia law." *Id.* at 109. The *Adams* court appeared to agree, finding that "[t]here are several counts alleged in plaintiff's complaint that are not recognized as causes of action in the State of Virginia, even if they are recognized as a cause of action in [D.C.]." *Id.* at 110.

7

Notably, Virginia and D.C. are both common-law jurisdictions.[5] D.C. CODE § 45-401(a); VA. CODE § 1-200. As such, on its face, *Adams* does not support Defendants' contention that Louisiana's civil law system creates an inherent conflict with D.C. law by virtue of being a civil law system. *See generally id.* The Court is not prepared to independently find in light of *Adams*, and absent any true supporting case law, that Louisiana law fundamentally conflicts with all other states' laws because it adheres to a civil law system. As such, Defendants' second conflict contention fails to establish a conflict.

Third and finally, Defendants' contention that D.C. applies either a consumer-expectation or a risk-utility test in product defect cases is attenuated and somewhat misleading. (Defs.' Reply Br. 25 n.9 (quoting *Wilson Sporting Goods Co. v. Hichox*, 59 A.3d 1267, 1274-75 (D.C. 2014)).) To be exact, Defendants contend that D.C. and Louisiana "apply different standards to allegations of product defect." (*Id.*) In so arguing, Defendants correctly note that Louisiana applies the "risk-utility analysis" when evaluating a design defect allegation. (*Id.* (citing *McFarlin v. N.H. Ins. Co.*, No. 12-3033, 2016 WL 3645200, at *5 (W.D. La. June 30, 2016))); *see also* LA. REV. STAT. § 9:2800.56 (outlining the elements for a design defect claim in Louisiana). Defendants then cite a D.C. Supreme Court case that they contend establishes that D.C. will apply either the consumer-expectation test or the risk-utility test in product defect cases, depending on the circumstances of the case. (Defs.' Reply Br. 25 n.9 (citing *Wilson*, 59 A.3d at 1274-75).)

The D.C. decision that Defendants cite to support this proposition does not establish that D.C. law applies the consumer-expectation test in product defect cases. Instead, as the D.C. Supreme Court notes in *Wilson*, although relevant case law "raises the possibility that the

---

[5] Peter F. Schlosser, *Lectures on Civil-Law Litigation Systems and American Cooperation with Those Systems*, 45 U. KAN. L. REV. 9, 9 n.1 (1996).

8

consumer-expectation test might apply in [certain] circumstances . . . this court has not applied the consumer-expectation test in any case." *Wilson*, 59 A.3d at 1275 n.5. The court then finds that "[i]t therefore is an *open question* whether the consumer-expectation test is applicable in [D.C.]," and the court intentionally does not answer that question on the facts of the case.[6] *Id.* (emphasis added). This "open question" and the D.C. Supreme Court's affirmation that the consumer-expectation test has never been deployed before it, renders Defendants' third conflict argument unpersuasive. *Id.*

For the reasons outlined above, Defendants fail to show any true conflict between D.C. and Louisiana product liability laws. With no true conflict identified, Scroggins's claims, by default, will be assessed under D.C. law. *Solomon*, 583 F. Supp. 3d at 197 (citations omitted).

**B.     Defendants' Arguments for Summary Judgment under D.C. Law**

Defendants contend that Scroggins fails to supply sufficient evidence that: (1) J&J Baby Powder could be a "substantial contributing cause of her injury"; and (2) Walton applied talcum-based J&J Baby Powder in her underwear as opposed to cornstarch-based J&J Baby Powder. (Defs.' Moving Br. 56-59.) Both contentions fail.

First, Scroggins points to expert evidence in the record which suggests that *any* exposure to talcum powder could be a substantial contributing cause of the development of ovarian cancer. (Pl.'s Opp'n Br. 10-11 (citing Apr. 27, 2020 Op. 69, No. 16-2738, ECF No. 13186); Pl.'s Ex. 8, McTiernan Rep. *392, ECF No. 43-8.) In response, Defendants argue to the contrary despite citing no relevant case law that establishes that six years of J&J Baby Powder use fifty years ago is

---

[6] It is likely that the *Wilson* court declined to take on the question of whether the consumer-expectation test is applicable in D.C. because of the unique posture of the case. Specifically, the only reason that the "consumer-expectation" test was even considered by a jury in *Wilson* is because the *Wilson* plaintiff accidently but "explicitly assented at trial to jury instructions that required the jury to make findings under a consumer-expectation test, even though the plaintiff argued his position under the risk-utility test." *Wilson*, 59 A.3d at 1275.

legally insufficient to show that J&J Baby Powder was a substantial contributing cause of Walton's ovarian cancer diagnosis. (Defs.' Reply Br. 24-25 (citing *Claytor v. Owens-Corning Fiberglas Corp.*, 662 A.2d 1374, 1385 n.11 (D.C. 1995) (finding that referring generally to decades of exposure to asbestos is inadequate to defeat a summary judgment motion but where, unlike here, the plaintiffs were unable to provide any evidence that the defendants' asbestos-bearing products were in the same place at the same time as the plaintiffs)).) Moreover, Scroggins testified that Walton used J&J Baby Powder until 1981, which, if accepted by a jury, would establish that Walton used J&J Baby Powder for up to twenty-two years, greatly increasing Walton's alleged exposure to talcum powder.[7] (Defs.' Ex. 2, Scroggins Dep. 35:11-36:15.) For these reasons, genuine disputes of material fact remain as to whether Walton's use of J&J Baby Powder rendered the product a "substantial contributing cause" of Walton's ovarian cancer. (Pl.'s Opp'n Br. 7.)

Second, Scroggins contends and submits evidence that Walton used the talcum-based J&J Baby Powder as opposed to the cornstarch-based J&J Baby Powder. (Pl.'s Opp'n Br. 3; J&J Email Correspondences, Pl.'s Ex. 5, ECF No. 43-5.) Hawkins testified that she observed Walton using J&J Baby Powder for a five-year period sometime between 1959 and 1965. (DSUMF ¶ 17; Pl.'s Opp'n Br. 2.) Scroggins testified, to the best of his recollection, that Walton used J&J Baby Powder in or around 1966, and again between 1971 and 1981. (Defs.' Moving Br. 3; Defs.' Ex. 2, Scroggins Dep. 35:11-36:15.) Scroggins also provides evidence that the cornstarch-based J&J Baby Powder was not available in the United States until 1986. (J&J Email Correspondences, Ex. B.) Defendants point to insufficient evidence in their reply brief to rebut Scroggins's presented

---

[7] Defendants make much to do about Scroggins never physically seeing Walton, his mother, apply J&J Baby Powder in her perineal region. (*See, e.g.*, Defs.' Reply Br. 26.) This does not, as Defendants suggest, in and of itself invalidate Scroggins's testimony that Plaintiff used J&J Baby Powder. (*See id.*)

evidence. (*See generally* Defs.' Reply Br.) The evidence Scroggins submits, if credited by a jury, would render Defendants' contention that Walton used cornstarch-based J&J Baby Powder untenable. This is because Scroggins provides evidence that she only used J&J Baby Powder *before* 1986, and therefore, *before* cornstarch-based J&J Baby Powder became available in the United States. (DSUMF ¶ 17; Pl.'s Opp'n Br. 2; Scroggins Dep. 35:11-36:15, Defs.' Ex. 2.) As such, there is evidence in the record to establish a genuine dispute of material fact as to whether Walton used talcum-based J&J Baby Powder or cornstarch-based J&J Baby Powder.

Finally, Scroggins contends that Defendants' Motion for Summary Judgment is premature. (Pl.'s Opp'n Br. 8-11.) As the Court has already determined that Defendants' Motion for Summary Judgment fails on its merits, the Court does not need to reach this issue.

### IV. CONCLUSION

For the reasons outlined above, Defendants fails to establish that no genuine dispute of material fact remains as to all of Plaintiff's claims. As such, Defendants' Motion for Summary Judgment against Plaintiff's claims is denied.

*/s/ Michael A. Shipp*
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE